[No. 38975-1-I.   Division One.   August 31, 1998.]

THE CITY OF BELLEVUE, *Respondent*, v. JON M. LORANG, *Petitioner.*

*Michael L. Mittlestat* of *Washington Appellate Project*, for petitioner.

*Richard L. Andrews, City Attorney*, and *Jerome Y. Roache, Assistant*, for respondent.

ELLINGTON, J. — Jon Marc Lorang was convicted of telephone harassment under BELLEVUE CITY CODE (BCC) 10A.84.090.[1] We granted his petition for discretionary review to consider whether the ordinance violates the free speech provisions of the federal or state constitutions by seeking to prohibit the use of "profane" language. Mr. Lorang contends that the term "profane" has antireligious connotations and that the ordinance's ban is therefore viewpoint-based. We construe the word "profane" in its secular sense and conclude the Bellevue ordinance is facially constitutional. To ensure that the antireligious meaning of "profane" is not applied in future cases involving the same or similar statutes, juries should be provided an instruction including the secular definition of the term. Although no such instruction was given in this case, we decline Mr. Lorang's request for remand and a new trial because, excluding the one arguably antireligious statement at issue, we find the evidence of guilt overwhelming. We therefore affirm.

## Facts

During the period leading to the telephone calls at issue, Mr. Lorang was involved in a dispute with the King County Housing Authority over his housing status. The Housing Authority required Mr. Lorang to move from one complex to another, an action which he apparently felt constituted harassment and retaliation. On August 5, 1994, Mr. Lorang left four messages on the answering machine at his apartment complex office. In the messages, Mr. Lorang used offensive language of a sexual nature and racial slurs.[2] In addition, he referred to the Housing Authority (or the

---

[1]BCC 10A.84.090(A) defines telephone harassment as making a telephone call to another "with intent to disturb, embarrass, harass, intimidate, threaten or torment" such person: "(1) Using any lewd, lascivious, profane, indecent or obscene words or language, or suggesting any lewd or lascivious act; or . . . (4) Without purpose of legitimate communication."

[2]He referred to a female employee of the Housing Authority as a "twat" and a "bitch." He also referred to an African-American employee as "Charley-boy . . . bringing nine bros."

County) as "King of kings." This last statement is the focus of this appeal.

The City of Bellevue charged Mr. Lorang with one count of telephone harassment for these four calls. The trial court instructed the jury that, to convict Mr. Lorang of harassment, it must find that he telephoned "any other person with intent to disturb, embarrass, harass, intimidate, threaten or torment such other person" and that he called "[u]sing any lewd, lascivious, *profane*, indecent or obscene words or language, or suggesting any lewd or lascivious act" or "[w]ithout purpose of legitimate communication." (Emphasis added.) The court defined intent, but did not define any other terms.

The jury found Mr. Lorang guilty. He filed an appeal pursuant to RALJ 2.2(a), challenging the sufficiency of the evidence and, for the first time, challenging the constitutionality of the telephone harassment ordinance as applied to him. On review, the King County Superior Court affirmed, finding the evidence sufficient and holding that the ordinance was not overbroad as applied to Mr. Lorang. He then sought discretionary review pursuant to RAP 2.3(d), reasserting his insufficiency of the evidence claim and raising a new challenge to the facial validity of the ordinance. We granted review solely on the constitutional issue.

## Regulating Speech

We are for the first time faced squarely with the issue whether defining telephone harassment as telephoning (with the requisite intent) using "profane" language violates the First Amendment of the United States Constitution[3] or article I, section 5 of the Washington Constitu-

---

[3]"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I.

tion.[4] Our courts have thus far rejected first amendment challenges to laws criminalizing telephone harassment. *See City of Seattle v. Huff*, 111 Wn.2d 923, 767 P.2d 572 (1989); *State v. Alexander*, 76 Wn. App. 830, 888 P.2d 175 (1995); *State v. Dyson*, 74 Wn. App. 237, 872 P.2d 1115 (1994). In *Huff* and *Dyson*, however, the courts were not confronted with the issue whether the prohibition of "profane" speech in the context of telephone harassment is facially constitutional. Likewise, although the court in *Alexander* rejected the defendant's challenge that "profane" as used within the telephone harassment statute was unconstitutionally overbroad, the majority[5] did not address the issue whether, in light of the antireligious connotations of "profane," the statute impermissibly regulated speech on the basis of viewpoint. Thus, we must analyze anew the issue presented here.

We begin our analysis by examining the holding in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992). In *R.A.V.*, the Supreme Court struck down a "hate crimes" statute that criminalized the placing on public or private property of symbols or objects that are known to arouse anger, alarm, or resentment in others on the basis of race, color, creed, religion, or gender. 505 U.S. at 380. In reaching its holding, the *R.A.V.* Court began with the proposition that content-based regulations on speech are presumptively invalid. *Id.* at 382. Certain categories of speech, however, may be restricted on the basis of content because they are " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Id.* at 383 (quoting *Chaplinsky v. New Hampshire*,

---

[4]"Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Const. art. I, § 5. In determining whether speech regulation in a nonpublic forum violates article I, section 5, we have adopted the federal analysis developed with respect to the First Amendment. *See City of Seattle v. Huff*, 111 Wn.2d 923, 928, 767 P.2d 572 (1989).

[5]In his concurrence in *Alexander*, Judge Baker observed that the trial court had instructed the jury on the secular definition of "profane," and that such instruction was, in his opinion, a prerequisite to upholding the constitutionality of the statute at issue. 76 Wn. App. at 843-44 (Baker, J., concurring).

315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)). These proscribable categories of speech have evolved from those first enunciated in *Chaplinsky*, namely:

> the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.

315 U.S. at 572. Although the scope of these exceptions to the prohibition against content-based regulation has narrowed over time, the "categorical approach has remained an important part of [the Supreme Court's] First Amendment jurisprudence." *R.A.V.*, 505 U.S. at 383.

■ In *R.A.V.*, however, the Supreme Court took what some view as a step back from the categorical approach,[6] stating that, although certain areas of speech may be regulated because of their content, they are not entirely invisible to the Constitution and cannot "be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* at 383-84. We do not, however, interpret *R.A.V.* as retreating from the categorical approach. Instead, we read *R.A.V.* as confirming that viewpoint neutrality is required in speech regulation, even when the area of speech being affected falls within a category traditionally afforded minimal or no protection.[7] *See id.* at 384 (providing as an example that "the govern-

---

[6]*See* 505 U.S. at 400-02 (White, J., concurring); *id.* at 418-19 (Stevens, J., concurring); *see also* Jerome O'Callaghan, *Free Speech by the Light of a Burning Cross*, 42 CLEV. ST. L. REV. 215 (1994); Aviva O. Wertheimer, *The First Amendment Distinction Between Conduct and Content: A Conceptual Framework for Understanding Fighting Words Jurisprudence*, 63 FORDHAM L. REV. 793 (1994).

[7]In *R.A.V.*, the Court posits that the standard for evaluating content-discriminatory regulations differs depending on whether the speech at issue is fully protected or within a proscribable category. 505 U.S. at 387. Although content discrimination is presumptively invalid, such discrimination is permissible with respect to proscribable classes of speech in the following instances: (i) "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable," *id.* at 388 (e.g., prohibiting only that obscenity that is most patently offensive in its prurience, or criminalizing only those threats of violence directed against the President); (ii) when the proscribable category of speech is "associated with particular 'secondary effects' of the speech, so that the regulation is 'justified without reference to the content

ment may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government"); *see also id.* at 391-92 (observing that the hate crimes statute at issue in *R.A.V.* went beyond content discrimination and actually discriminated on the basis of viewpoint: "St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.").

### Defining "Profane"

We are faced here with a challenge to the viewpoint neutrality of the term "profane" within the meaning of the Bellevue telephone harassment ordinance. Construction of the term is our first task.

▮ Ordinances are presumed constitutional, and Mr. Lorang bears the burden of demonstrating otherwise in this case beyond a reasonable doubt. *City of Spokane v. Fischer,* 110 Wn.2d 541, 542, 754 P.2d 1241 (1988). When possible, we will construe an ordinance to uphold its constitutionality. *State v. Reyes,* 104 Wn.2d 35, 41, 700 P.2d 1155 (1985). We narrowly construe criminal ordinances affecting speech so that they prohibit only unprotected speech. *Id.* at 40 (citing *Gooding v. Wilson,* 405 U.S. 518, 522, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972)). Ultimately, we seek to effectuate the legislative intent, although within constitutional constraints. *See State v. Standifer,* 110 Wn.2d 90, 92, 750 P.2d 258 (1988) (citing *State v. Bernhard,* 108 Wn.2d 527, 533, 741 P.2d 1 (1987)).

▮ When a term is not specifically defined, we apply its ordinary meaning. 110 Wn.2d at 92; *see also State v. McDougal,* 120 Wn.2d 334, 350, 841 P.2d 1232 (1992). WEBSTER's dictionary defines profane as:

---

of the . . . speech,'" *id.* at 389 (e.g., permitting all obscene live performances except those involving minors; also, laws against treason or sexual discrimination in employment practices); and (iii) when the content discrimination "does not threaten censorship of ideas," *id.* at 393. In contrast to content discrimination, we understand *R.A.V.* to condemn viewpoint discrimination regardless of whether the speech affected is fully protected or within a proscribable class. *See id.* at 391-92.

1 : unconcerned with that which is religious or with the purposes of religion : not devoted to the sacred and the holy . . . 2 : not holy because unconsecrated, impure, or defiled . . . 3 a : serving to debase or defile that which is holy or worthy of reverence : contemptuous of beautiful or sacred things . . . b (1) : characterized by abusive language directed esp. against the name of God (2) : indulging in cursing or vituperation : marked by insulting or perverted utterance . . . .

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1810 (1976) [hereinafter WEBSTER'S]. Another dictionary defines profane as:

1. Showing contempt or irreverence toward God or sacred things; blasphemous . . . . 4. Vulgar; coarse.

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, NEW COLLEGE ED. 1044 (1981). Thus, the term "profane" apparently has both antireligious and secular meanings.

In addition, both usages are common. Courts construing the term "profane" have often given it its meaning of irreverence toward God or holy things. *See, e.g., Duncan v. United States*, 48 F.2d 128, 133-34 (9th Cir. 1931) (discussing cases); *State v. Authelet*, 120 R.I. 42, 385 A.2d 642, 644, 5 A.L.R.4TH 942 (1978) (courts "have invariably held the word to mean any words importing an imprecation of divine vengeance or implying divine condemnation or irreverence toward God or holy things"). On the other hand, courts confronting a constitutional challenge tend to give the term its secular meaning, as referring to crude, vulgar, or grossly offensive speech. *See, e.g., Tallman v. United States*, 465 F.2d 282, 286 (7th Cir. 1972); *State v. Richards*, 127 Idaho 31, 896 P.2d 357, 364 (1995).

■ The City urges us to construe the term "profane" in context with the other terms in the telephone harassment ordinance. We agree that well-known rules of statutory construction allow us to apply the secular definition of "profane." A "familiar principle of statutory construction [is] that words grouped in a list should be given related meaning." *Third Nat'l Bank in Nashville v. Impac Ltd.*,

432 U.S. 312, 322, 97 S. Ct. 2307, 53 L. Ed. 2d 368 (1977). As one court has remarked, "words are known by the company they keep." *State v. Kipf*, 234 Neb. 227, 450 N.W.2d 397, 404 (1990).

■ ■ In the Bellevue ordinance, "profane" keeps company with a list of several types of obnoxious language: lewd, lascivious, indecent, obscene. In this company, we agree that of the two common usages for the term "profane," the proper construction—and the one most likely to reflect actual legislative intent—is the secular one: vulgar, crude, insulting language.

In addition, we believe that application of the secular definition is necessary to avoid any constitutional issue. We are of the opinion that, if accorded its antireligious meaning, profane language would not be properly included within the *Chaplinsky* categories of proscribable speech. Antireligious speech cannot be said to have so little value in the marketplace of ideas that its proscription does less harm than good, especially in this country founded upon freedom from established religion. Even were profane (meaning antireligious) language within a proscribable category of speech, however, its prohibition would constitute an impermissible viewpoint-based restriction. For example, one who telephones another and reads with reverence from a holy text does not violate BCC 10A.84.090(A)(1) even if his or her intent is to harass, whereas one who acts with the same intent but whose message is blasphemy, may read the same passage with sarcasm and be guilty of a crime. This is not the viewpoint neutrality required by the Supreme Court's holding in *R.A.V.*

We must therefore assign "profane" its secular meaning. So construed, profane (meaning vulgar or coarse) language easily occupies a place equivalent to the other *Chaplinsky* categories of speech entitled to minimal protection because of their low value in the exchange of ideas. In addition, it is viewpoint neutral, and thus under *R.A.V.* poses no over-

breadth problem in a reasonable regulation.[8] To ensure that the antireligious meaning of "profane" is not applied in future cases involving the same or similar telephone harassment statutes, juries should be provided an instruction including the secular definition of the term.

## Remand Unnecessary

Because the secular definition of "profane" was not provided to the jury at Mr. Lorang's trial, he requests remand for a new trial. Although the phrase "King of kings"[9] could conceivably be construed as blasphemous, we nevertheless affirm Mr. Lorang's conviction because the alleged error is harmless. A constitutional error is harmless if the court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error. *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996). In applying a harmless error analysis, we look only at the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985). Here, the unrebutted evidence established beyond a reasonable doubt that Mr. Lorang used obscene[10] language in the context of harassing telephone calls. Despite the absence of a proper limiting instruction, we find no possibility that Mr. Lorang was convicted solely for antireligious speech.

Affirmed.

---

[8]Mr. Lorang does not challenge the reasonableness of the Bellevue telephone harassment ordinance.

[9]*Revelation* 17:14 ("These shall make war with the Lamb, and the Lamb shall overcome them: for he is Lord of lords, and King of kings: and they that are with him are called, and chosen, and faithful.").

[10]*See* WEBSTER's at 1557 (defining obscene as "1 a : disgusting to the senses . . . b : grossly repugnant to the generally accepted notions of what is appropriate : SHOCKING 2 : offensive or revolting as countering or violating some ideal or principle : as . . . b : marked by violation of accepted language inhibitions and by the use of words regarded as taboo in polite usage").

KENNEDY, C.J., and GROSSE, J., concur.

Review granted at 137 Wn.2d 1027 (1999).